# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-CA-00375-SCT

*MARILYN NEWSOME, INDIVIDUALLY AND AS*
*CONSERVATOR/CONSERVATRIX OF VICTORIA*
*NEWSOME*

*v.*

*PEOPLES BANCSHARES d/b/a PEOPLES BANK*
*AND CHRIS DUNN*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/01/2017 |
| TRIAL JUDGE: | HON. JAMES D. BELL |
| TRIAL COURT ATTORNEYS: | W. TERRELL STUBBS |
| | WILLIAM C. BRABEC |
| COURT FROM WHICH APPEALED: | SIMPSON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | W. TERRELL STUBBS |
| ATTORNEYS FOR APPELLEES: | LINDSEY O. WATSON |
| | WILLIAM C. BRABEC |
| | TIMOTHY J. ANZENBERGER |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED IN PART, REVERSED IN PART AND REMANDED. ON CROSS-APPEAL: AFFIRMED - 10/04/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KITCHENS, P.J., KING AND CHAMBERLIN, JJ.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.     The instant case addresses whether the claims of the Appellant, Marilyn Newsome,

survive summary judgment against Appellees, People's Bank and Chris Dunn. The claims

address the issuance of cashier's checks by People's Bank and Chris Dunn without the

signature or approval of the conservatorship account holder, Marilyn Newsome. For the reasons expounded upon below on the direct appeal, the Court affirms the judgment of the trial court in part and reverses and remands in part. On the cross appeal, under different reasoning, the Court affirms the judgment of the trial court.

## STATEMENT OF FACTS

¶2. On February 9, 2015, Marilyn Newsome filed suit against Chancellor David Shoemake, former Chancellor Joe Dale Walker, Keely McNulty, People's Bank (the Bank), and Chris Dunn (Dunn). The instant appeal focuses only on the liability of the Bank and Dunn, if any. Therefore, the alleged liability and/or wrongdoing of the additional parties[1] is not at issue and is neither addressed in the facts provided below nor in the analysis.

¶3. In 2010, Charles Merkel of Merkel & Cocke hired Keely McNulty (McNulty), an attorney, to set up the conservatorship for his client, Victoria Newsome. Victoria Newsome had settled a medical malpractice case, but she was unable to manage her affairs. The trial court appointed Marilyn Newsome (Newsome), Victoria Newsome's mother, as the conservator for Victoria Newsome. The trial court then denied the request to purchase a home for Victoria Newsome, and instead, the trial court ordered that a house be built for her. In the interim, the trial court ordered a mobile home to be purchased.

¶4. With the help of Dunn, a Bank employee, Newsome opened a checking account for the conservatorship with the Bank. When Newsome opened the conservatorship account, she

---

[1]*See **Newsome v. Shoemake**, 234 So. 3d 1215 (Miss. 2017); **In re Conservatorship of Newsome**, 186 So. 3d 830 (Miss. 2016); **Miss. Comm'n on Judicial Performance v. Shoemake**, 191 So. 3d 1211 (Miss. 2016); **Miss. Comm'n on Judicial Performance v. Walker**, 172 So. 3d 1165 (Miss. 2015).

signed a Deposit Agreement.[2]  According to the Deposit Agreement, Newsome was the sole

authorized signor on the account.  Newsome testified that she did not have any discussions

with the Bank about who would be authorized to sign on the account.  The Deposit

Agreement also provided that Newsome had thirty days to review her statements for errors

or unauthorized activity.

¶5.    With the conservatorship account opened, McNulty began coordinating the process

of building the house, which included hiring a contractor, paying subcontractors, and

generally, supervising the building of the residence.  In order to pay the subcontractors and

herself, McNulty drafted court orders[3] that provided for the release of funds from the

conservatorship account.  After the trial court signed the orders, McNulty then sent or

delivered the court orders to the Bank for release of the funds.[4]  The court orders did not

provide any guidance on how disbursements should occur.  Specifically, the court orders did

not provide for the issuance of cashier's checks to disburse the money.  In her affidavit,

McNulty testified that she instructed the Bank to issue cashier's checks for the money.

¶6.    To issue the cashier's checks, the Bank withdrew money from Newsome's

conservatorship account, placed it in the Bank's account and with a bank employee's

signature, issued official Bank checks to McNulty and various subcontractors. Usually, the

_____

[2]The applicable sections of the Deposit Agreement will be covered in greater detail below.

[3]Most of the court orders were not accompanied by petitions.

[4]Although the court orders were not certified, the Bank states in its brief that it verified that the requested disbursements had been authorized by the trial court.

3

checks were signed by Dunn. Newsome's signature did not appear on any of the cashier's checks. The withdrawals were shown on Newsome's statements as "Miscellaneous Debit." No further information was provided on the statements, and if more than one cashier's check was issued at one time, the "Miscellaneous Debit" on the statement would lump the entire sum of a number of checks together.

¶7. The process continued from March 2011 to October 2011, as the residence was built. Through the process, over $400,000 was transferred out of the conservatorship account.

¶8. Dunn testified that while the residence was being built and the cashier's checks were being issued, Newsome frequently visited the Bank, and sometimes she would bring Victoria Newsome to visit as well. Dunn claims that Newsome never mentioned that she was not receiving her monthly statement and that she never communicated that McNulty "did not have the right to direct payment orders." On the other hand, although she cannot remember the date, Newsome claims that she asked Dunn about why she was not receiving her monthly statement and about the account. She states that Dunn only told her to consult McNulty and the trial court.

¶9. On February 9, 2015, Newsome filed suit against the Bank and Dunn alleging common-law claims: conspiracy, fraud, breach of contract, negligence, breach of the duty of good faith and fair dealing, negligence per se, gross negligence, and intentional infliction of emotional distress. Further, falling under the Uniform Commercial Code (UCC), Newsome alleged that the Bank and Dunn were liable for failing to require Marilyn's signature on any of the checks negotiated on the conservatorship account.

4

¶10. The parties filed competing motions for summary judgment. The Bank and Dunn argued that Newsome's claims were barred by the statute of repose in Mississippi Code Section 75-4A-505 and that the Bank and Dunn were not at fault because McNulty had the authority to act on Newsome's behalf. Newsome argued that she was entitled to summary judgement as to liability and actual damages. The trial court denied Newsome's motion for summary judgment on liability and actual damages, and it denied the Bank and Dunn's motion for summary judgment on the statute of repose issue. However, the trial court granted the Bank and Dunn's motion for summary judgment as to McNulty's authority, dismissing the Bank and Dunn.[5] Newsome appealed the dismissal of the Bank and Dunn, and the Bank and Dunn cross-appealed the statute of repose issue.

## STATEMENT OF ISSUES

¶11. The Court distinguishes between the direct appeal and the cross-appeal. Further, for clarity, the Court addresses the cross-appeal first.

## CROSS-APPEAL

**Whether the claims are barred by the one-year statute of repose.**

## DIRECT APPEAL

(1) **Whether People's Bank and Chris Dunn are entitled to summary judgment due to Keely McNulty's actual, implied, and/or apparent authority.**

(2) **Whether the duty to review statements contained in the Deposit Agreement warrants summary judgment.**

---

[5]The final judgment contains a Rule 54(b) certification.

**(3)** **Whether the Uniform Commercial Code displaces Marilyn Newsome's common-law claims.**

**(4)** **Whether People's Bank risked contempt of court if it refused to comply with the trial court's orders.**

**(5)** **Whether Chris Dunn is entitled to summary judgment as to claims against him in his individual capacity.**

## STANDARD OF REVIEW

¶12. The Court reviews a motion for summary judgment de novo. ***Kinney v. S. Miss. Planning & Dev. Dist., Inc.***, 202 So. 3d 187, 192 (Miss. 2016). "The evidence is viewed in the light most favorable to the party opposing the motion. The moving party has the burden of demonstrating no genuine issue of material fact exists." ***Id.*** "Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" ***Id.*** (quoting ***Hosemann v. Harris***, 163 So. 3d 263, 267 (Miss. 2015)).

## CROSS-APPEAL ANALYSIS

**Whether the claims are barred by the one-year statute of repose.**

¶13. The Bank and Dunn argue that the statute of repose, codified in Chapter 4A of the UCC, applies and bars Newsome's claims. *See* Miss. Code Ann. § 75-4A-505 (Rev. 2016).[6]

---

[6]The statute of repose provides:

> If a receiving bank has received payment from its customer with respect to a payment order issued in the name of the customer as sender and accepted by the bank, and the customer received notification reasonably identifying the order, the customer is precluded from asserting that the bank is not entitled to retain the payment unless the customer notifies the bank of the customer's

Further, the Bank and Dunn maintain that Newsome is barred from arguing that the cashier's checks were not fund transfers because she failed to make that argument below. On the other hand, Newsome claims that Article 4A only applies to wire transfers, and here, the Bank and Dunn improperly commingled conservatorship funds with the Bank's funds. Although not binding under the de novo standard of review, the trial court denied summary judgment on the instant issue, finding a question of fact.[7]

¶14.    Before delving into the merits of the statute-of-repose claim, the Court considers the Bank and Dunn's argument that the issue is barred. As argued by the Bank and Dunn, the Court need not consider an issue raised for the first time on appeal. *Flagstar Bank, FSB v. Danos*, 46 So. 3d 298, 311 (Miss. 2010). However, here, Newsome clearly argued before the trial court that the statute of repose does not apply. Specifically, during the hearing on the competing motions for summary judgment, Newsome argued that because the Bank itself signed the cashier's checks, the statute of repose does not apply. Thus, the issue was considered and is not barred. Accordingly, the Court proceeds to the merits of the cross-appeal.

----

objection to the payment within one (1) year after the notification was received by the customer.

Miss. Code. Ann. § 75-4A-505.

[7]The trial court found an issue of fact existed about whether the "Miscellaneous Debit" information on Newsome's statement constituted "notification reasonably identifying the order." Miss. Code. Ann. § 75-4A-505. However, because we conclude that Chapter 4A does not apply to the transactions in question, we need not address whether the trial court's finding was correct.

¶15.    The statute of repose appears in Chapter 4A of the UCC. *See* Miss. Code Ann. § 75-4A-505 (Rev. 2016).  "The Court's role 'is not to decide what a statute should provide, but to determine what it does provide.'" ***Rankin Cty. Bd. of Supervisors v. Lakeland Income Props.*, *LLC*, 241 So. 3d 1279, 1283 (Miss. 2018) (quoting *Lawson v. Honeywell Int'l, Inc.*, 75 So. 3d 1024, 1027 (Miss. 2011))." The Court considers the words and phrases in the statutes "according to their common and ordinary acceptation and meaning; but technical words and phrases according to their technical meaning."  Miss. Code Ann. § 1-3-65 (Rev. 2014).

¶16.    Chapter 4A applies to "funds transfers defined in Section 75-4A-104." Miss. Code Ann. § 75-4A-102 (Rev. 2016).  Section 75-4A-104 defines funds transfers as:

> [T]he series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order. The term includes any payment order issued by the originator's bank or an intermediary bank intended to carry out the originator's payment order. A funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary of the originator's payment order.

Miss. Code Ann. § 75-4A-104(a) (Rev. 2016).

¶17.    An orginator is "the sender of the first payment order in a funds transfer." Miss. Code Ann. § 75-4A-104(c) (Rev. 2016).  The orginator can be a bank, but it need not be a bank. Miss. Code Ann. § 75-4A-104(d) (Rev. 2016).  However, if the originator is not a bank, the originator's bank is the bank that receives the payment order from the originator. *Id.*  A payment order is "an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing to pay, or to cause another bank to pay a fixed and determinable

8

amount of money to a beneficiary . . . ." Miss. Code Ann. § 75-4A-103 (a)(1) (Rev. 2016). In order to be considered a payment order, the instruction must stand up to three conditions: (1) it must "not state a condition to payment . . . other than time of payment," (2) "[t]he receiving bank is to be reimbursed by debiting an account of, or otherwise receiving payment from, the sender," (3) it must be "transmitted by the sender directly to the receiving bank or to an agent, funds-transfer system, or communication system for transmittal to the receiving bank." *Id.*[8]

¶18.    The definition of a funds transfer contemplates a bank-to-bank[9] transfer. The definition of a funds transfer states: "A funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary of the originator's payment order." Miss. Code Ann. § 75-4A-104(a).  Further, a beneficiary is defined as "the person to be paid by the *beneficiary's bank*." Miss. Code Ann. § 75-4A-103(a)(2) (Rev. 2016) (emphasis added).

¶19.    Here, the transactions in question are the Bank's and Dunn's removal of funds from the conservatorship account to an account for the Bank and the issuance of cashier's checks to beneficiaries, which were McNulty and various subcontractors.  The cashier's checks were

---

[8]A sender is defined as "the person giving the instruction to the receiving bank." Miss. Code Ann. § 75-4A-103(5) (Rev. 2016).  An originator is defied as "the *sender* of the first payment order in a funds transfer." Miss. Code Ann. § 75-4A-104(c) (Rev. 2016) (emphasis added). And a payment order is an instruction. *See* Miss. Code Ann. § 75-4A-103(a)(1) (Rev.  2016). Therefore, under Chapter 4A, the receiving bank is the same entity as the originator's bank, and the sender is the same entity as the originator.

[9]The bank-to-bank transfer can be a transfer between the same bank. Miss. Code Ann. § 75-4A-104 cmt. 1 (West, Westlaw through 2018 Legis. Sess.).

signed by bank employees. The Bank and Dunn never dealt with a beneficiary bank, as the checks were issued directly to beneficiaries. Therefore, the instant facts do not fit under the definition of a funds transfer. Further, the comment to Section 75-4A-104 offers guidance on whether a check is considered a funds transfer.

¶20. The comment states that checks usually are not funds transfers because the instruction is delivered by the debtor to the creditor who then presents it to the bank. Miss. Code Ann. § 75-4A-104 cmt. 5 (West, Westlaw through 2018 Legis. Sess.). The comment, however, goes on to give an exception that is extremely helpful:

> Assume that Originator instructs Originator's Bank to pay $10,000 to the account of Beneficiary in Beneficiary's Bank. . . . Originator's Bank may execute Originator's order by issuing a *teller's check* payable to *Beneficiary's Bank* for $10,000 along with instructions to credit Beneficiary's account in that amount. The instruction to Beneficiary's Bank to credit Beneficiary's account is a *payment order*. The check is the means by which Originator's Bank pays its obligation as sender of the payment order.

Miss. Code Ann. § 75-4A-104 cmt. 5 (West, Westlaw through 2018 Legis. Sess.) (emphasis added). Here, as stated above, the cashier's checks at issue were issued to the beneficiaries—McNulty and various subcontractors—in the court orders, not to a beneficiary bank. Therefore, no payment order existed, and the instant limited exception does not apply.

¶21. Thus, for the reasons detailed above, the cashier's checks at issue do not qualify as payment orders, and without qualifying as a payment order, they are also not funds transfers as contemplated under Chapter 4A. Therefore, Chapter 4A's statute of repose does not apply, and we need not address the trial court's finding. The trial court's denial of summary judgment for the Bank and Dunn on this issue is affirmed, although on other grounds.

10

Further, as we have reached this affirmance as a matter of law and not fact, the instant issue need not be submitted to the jury.

DIRECT APPEAL ANALYSIS

**(1)  Whether People's Bank and Chris Dunn are entitled to summary judgment due to Keely McNulty's actual, implied, and/or apparent authority.**

¶22.   The Bank and Dunn argue that McNulty possessed actual, implied, and/or apparent authority.  Newsome responds, arguing that McNulty never possessed actual, implied, or apparent authority.

A.   Actual Authority

¶23.   The Bank and Dunn argue that McNulty had actual authority to manage and direct payment orders because Newsome's conservatorship account was a court-administered and court-supervised account requiring court orders and directions from the judge.  Further, the Bank and Dunn point out that Newsome knew McNulty was managing the account.  On the other hand, Newsome argues that no record evidence exists of written or oral terms by which Newsome had granted any authority to McNulty.

¶24.   Actual authority, also termed express or direct authority, is the authority *actually conferred* by the principal. *See **McFarland v. Entergy Miss., Inc.***, 919 So. 2d 894, 902 (Miss. 2005).  The Court has stated:  "An express agent is one who is in fact authorized by the principal to act on their behalf." ***Id.*** (internal quotation omitted).  Although both parties cite the wrong cases for the point that actual authority is determined from the standpoint of the agent, the parties are correct in their assertion.  The Restatement states that actual

11

authority arises as "reasonably understood by the agent." Restatement (Third) of Agency § 3.01 (2006). The Restatement further provides that a manifestation by the principal must occur. *Id.* A manifestation is defined as expressive conduct. Restatement (Third) Of Agency § 3.01 cmt. b (2006). Specifically, "[a] principal's unexpressed willingness that another act as agent does not create actual authority." *Id.*

¶25. Newsome denies that she gave McNulty any authority. Upon review of the record, we agree, and we find no expressive conduct by Newsome. If anything, unexpressed willingness exists, which is not enough to overcome summary judgment. Notably, the Bank and Dunn, as stated above, base their actual-authority argument on the court-administered status of the account and on Newsome's alleged knowledge. However, without showing expressive conduct by Newsome, the law simply does not contemplate these two facts as sufficient to establish actual authority. Thus, the instant argument is without merit.

### B. Implied Authority

¶26. All the parties cite *Forest Hill Nursing Center, Inc. v. McFarland*, 995 So. 2d 775 (Miss. Ct. App. 2008), in support of their implied-authority arguments. Upon review, we find some contradiction in Mississippi law about whether implied authority is interchangeable with apparent authority.

¶27. In *Forest Hill*, the Court of Appeals relied on *Capital Associates Inc. v. Sally Southland, Inc.*, 529 So. 2d 640 (Miss. 1988), to state that "[i]mplied agency requires that the principal give the agent actual authorization to perform acts which reasonably lead third

12

parties to believe that an agency relationship exists." ***Forest Hill***, 995 So. 2d at 781. ***Forest Hill*** also addressed apparent authority. ***Id.***

¶28.    On the other hand, ***Capital Associates*** addressed implied authority but did not address apparent authority. ***Capital Assocs.***, 529 So. 2d at 644. ***Capital Associates*** listed only the existence of actual or express and implied authority. ***Id***.   In other cases, the Court has stated that "an agency relationship can be established through either actual or apparent authority." ***Barnes, Broom, Dallas & McLeod, PLLC v. Estate of Cappaert***, 991 So. 2d 1209, 1211 (Miss. 2008); *see also* ***McPherson v. McLendon***, 221 So. 2d 75 (Miss. 1969) (only addressing actual and apparent authority).[10]  Further, in ***Compere's Nursing Home, Inc. v. Estate of Farish ex rel. Lewis***, 982 So. 2d 382 (Miss. 2008), the Court stated that the

---

[10]The Court cited at length Mississippi's law on authority. First referencing actual authority and then moving on to apparent authority:

> The power of an agent to bind his principal is not limited to the *authority actually conferred* upon the agent, but the principal is bound if the conduct of the principal is such that persons of reasonable prudence, ordinarily familiar with business practices, dealing with the agent might rightfully believe the agent to have the power he assumes to have. The agent's authority as to those with whom he deals is what it reasonably appears to be. So far as third persons are concerned, the *apparent powers of an agent* are his real powers. 2 C.J.S. Agency, [§§] 95, 96. This rule is based upon the doctrine of estoppel. A principal, having clothed his agent with the semblance of authority, will not be permitted, after others have been led to act in reliance of the appearances thus produced, to deny, to the prejudice of such others, what he has theretofore tacitly affirmed as to the agent's powers. 2 C.J.S., Agency, [§] 96(c).

***McPherson***, 221 So. 2d at 78 (quoting ***Steen v. Andrews,*** 78 So. 2d 881, 883 (Miss. 1955) (emphasis added).

13

agreement at issue indicated "authority, either express or implied or apparent." ***Id.*** at 383. The Court then considered apparent authority, but it did not consider implied authority. ***Id.***

¶29.    Thus, given the inconsistencies in application of all three types of agency, we look to the definitions of implied authority and apparent authority. "Implied agency [or authority] requires that the principal give the agent *actual authorization to perform acts* which reasonably lead third parties to believe that an agency relationship exists." ***Forest Hill***, 995 So. 2d at 781 (emphasis added). Apparent authority, as will be explained in more detail below, requires *acts or conduct* by the principal *indicating* the agent's authority, and it requires reasonable reliance by a third party. *See **Estate of Cappaert***, 991 So. 2d at 1212. In sum, implied authority requires actual authorization for the agent to act; whereas, apparent authority looks to the principal's acts or conduct for an indication of the agent's authority. Thus, although similar, implied authority does differ from apparent authority.

¶30.    Here, even considering McNulty's affidavit and Judge Walker's appointment of McNulty to coordinate building the house, as concluded above, no proof exists in the record illustrating that Newsome exercised expressive conduct creating *actual authorization* for McNulty to act. *See **Forest Hill***, 995 So. 2d at 781. Thus, without even considering the second part of the implied authority definition, implied authority has not been shown, and summary judgment for the Bank and Dunn is not warranted.

### C.    Apparent Authority

¶31.    "Apparent authority exists when a reasonably prudent person, having knowledge of the nature and the usages of the business involved, would be justified in supposing, based on

14

the character of the duties entrusted to the agent, that the agent has the power he is assumed to have." ***Eaton v. Porter***, 645 So. 2d 1323, 1325 (Miss. 1994). Mississippi law imposes a three-prong test for determining if apparent authority exists:

> (1) acts or conduct by the principal indicating the agent's authority; (2) reasonable reliance by a third party upon those acts or conduct; and (3) detrimental change in position by the third party as a result of such reliance.

***Estate of Cappaert***, 991 So. 2d at 1212 (internal quotation omitted); *see also* ***Gulf Guaranty Life Ins. Co. v. Middleton***, 361 So. 2d 1377, 1383 (Miss. 1978). The Court also specifically has stated: "Whether the evidence sufficiently meets the three-prong test of apparent authority is an issue for the fact-finder." ***Andrew Jackson Life Ins. Co. v. Williams***, 566 So. 2d 1172, 1181 (Miss. 1990).

¶32. The Bank and Dunn argue that McNulty's affidavit establishes the first element of the three-prong test. McNulty's affidavit states that Newsome was aware that funds were being used to cover living expenses, attorneys' fees, and construction expenses. The Bank and Dunn maintain that Newsome did not communicate that McNulty was not authorized to withdraw funds from the conservatorship account, despite Newsome's knowledge that McNulty was withdrawing conservatorship account funds. The Bank and Dunn state that Newsome's actions indicated that McNulty had apparent authority to manage and direct payment orders from the conservatorship account.

¶33. Newsome argues that the Bank has not met the summary-judgment standard. Newsome states that McNulty's affidavit only contains conclusory allegations regarding McNulty's authority, despite the fact that the record is saturated with factual issues regarding

15

McNulty's authority. Further, Newsome maintains that the record does not show that Newsome gave McNulty any authorization.

¶34.    Mississippi caselaw provides: "[T]he principal is bound *if the conduct of the principal is such that persons of reasonable prudence, ordinarily familiar with business practices, dealing with the agent might rightfully believe the agent to have the power he assumes to have.*" **Steen**, 78 So. 2d at 883 (emphasis added). The evidence presented by the Bank establishes McNulty's knowledge, not the Bank's knowledge *at the time* McNulty was managing the conservatorship. In other words, McNulty's affidavit does not establish what the Bank knew, which is key to the first element of apparent authority.

¶35.    To understand what the Bank knew, Dunn's affidavit is crucial. Dunn's affidavit states: "It was my understanding that this was to be a court-administrated account and that no funds were to be transferred into or out of the account without a court order." Dunn's affidavit also states that "McNulty routinely instructed [him] by electronic or other means to issue cashier's checks." Further, Dunn's affidavit states that Newsome visited the Bank to request disbursements from the account, and Dunn repeatedly explained the need for a court order and for Newsome to consult with her attorney. Finally, Dunn states that Newsome never objected to the "payment orders directed by McNulty, [and] never communicated . . . that McNulty did not have the right to direct payment orders from the conservatorship account . . . ." On the other hand, Newsome testified in her deposition that she spoke to Dunn about the account because she did not know anything about the

16

conservatorship account and was not receiving a statement. Newsome further testified that Dunn would not tell her or show her anything about the account.

¶36. Dunn's affidavit illustrates the Bank's knowledge and does constitute evidence establishing the first element of apparent authority. *See Estate of Cappaert*, 991 So. 2d at 1212 ("acts or conduct by the principal indicating the agent's authority"). However, Newsome's deposition testimony calls into question Dunn's testimony regarding her acts or conduct indicating McNulty's authority, if any. "Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Kinney*, 202 So. 3d at 192. Thus, Newsome's and Dunn's testimonies create a disputed issue of material fact as to whether Newsome's conduct and actions indicated that McNulty had authority to disburse conservatorship funds; therefore, the establishment of the instant prong is best left up to a jury. *Williams*, 566 So. 2d at 1181 ("Whether the evidence sufficiently meets the three-prong test of apparent authority is an issue for the fact-finder.").

¶37. However, before concluding the instant issue, the Court analyzes subsidiary arguments addressed by the Bank and Dunn. The Bank and Dunn argue that because Newsome failed to stop McNulty, estoppel applies. Newsome does not make an estoppel argument but maintains that her lack of action did not ratify McNulty's actions because it was not a conscious decision.

17

¶38.    Apparent authority is based in the doctrine of estoppel.  "A principal, having clothed his agent with the semblance of authority, will not be permitted, after others have been led to act in reliance of the appearances thus produced, to deny, to the prejudice of such others, what he has theretofore tacitly affirmed as to the agent's powers."  *Steen*, 78 So. 2d at 883; *see also McPherson*, 221 So. 2d at 78.  Thus, in order for an estoppel argument to succeed, the principal must have clothed the agent with authority, and as stated above, here, this is a question of fact for the jury.

¶39.    The Bank and Dunn also argue that a presumption arises that an attorney who represents a party is authorized to take all action necessary.  Newsome argues that there is no court order appointing McNulty as counsel of record.  Thus, according to Newsome, McNulty was not her attorney.

¶40.    The Court has stated:

> It is always presumed that an attorney who has represented a party is authorized to do all acts necessary to properly conduct the litigation, and the party denying such authority has the burden of showing his want of authority, and is bound, as to the opposite party, by any act which the attorney does in the regular course of practice, however improper the act may be, if done without fraud or collusion.

*Great Atl. & Pac. Tea Co. v. Majure*, 168 So. 468, 472 (Miss. 1936).  The *Majure* Court went on to state: "[I]n [a] recent case . . . we held that an attorney could not bind a party unless he had been employed by such party . . . ."  *Id.*  In 2005, the Court considered *Majure* and reaffirmed that the above rule arises when the party *has employed* the attorney.  *Vaughn v. Rettig*, 912 So. 2d 795, 799 (Miss. 2005) (citing *Majure*, 168 So. at 472).  Whether a party has employed an  attorney—or, stated differently, whether an attorney-client relationship

18

exists—is fact-specific. ***Baker Donelson Bearman Caldwell & Berkowitz, P.C. v. Seay***, 42

So. 3d 474, 485 (Miss. 2010) ("This Court is careful to note that the existence of a

professional, attorney-client relationship is fact-specific. For example, the mere response to

a question at a social function does not create such a relationship."). A material issue of fact

creates a question for the jury. Miss. R. Civ. P. 56.

¶41.    Here, Charles Merkel of Merkel & Cocke hired McNulty to set up the conservatorship

for his client, Victoria Newsome. Thus, no evidence of a written or oral agreement between

Newsome and McNulty is in the record. Further, in January 2012,[11] the court appointed

McNulty guardian ad litem for Victoria Newsome. Therefore, McNulty's interests

potentially were adverse to Newsome's interests as the conservator. However, on the other

hand, the record provides that McNulty showed Newsome the progress of the house on at

least one occasion, and McNulty took fees through the court orders for her work coordinating

the building of the house. Thus, due to the conflicting material facts, a jury question exists

regarding whether McNulty represented Marilyn Newsome.

¶42.    In sum, we reverse and remand on the instant issue. Under the first prong of apparent

authority, summary judgment is not warranted. We decline to address the remaining prongs

of apparent authority because the existence of acts or conduct indicating McNulty's authority

clearly falls within the jury's purview.

---

[11]In January 2012, Newsome was in the midst of building the house. In March 2011, the judge denied the petition to approve the purchase of a home for Victoria Newsome and ordered that a home be built. In April 2012, McNulty filed a motion to withdraw as counsel for the conservatorship and as guardian ad litem.

19

**(2)** **Whether the duty to review statements contained in the Deposit Agreement warrants summary judgment.**

¶43. The Deposit Agreement for Newsome's conservator account states that Newsome must report any unauthorized transaction to the Bank within thirty days of the statement being sent or made available to her. The Bank and Dunn presented the affidavit of Julie Harris, Senior Vice President of the Bank, to establish that the statements had been mailed. They argue that, under the Mailbox Rule, a presumption arose that Newsome received the statements.

¶44. The Bank and Dunn are correct that "[t]here is a presumption that mail deposited, postage prepaid and properly addressed is timely delivered to the person addressed." *Thames v. Smith Ins. Agency, Inc.*, 710 So. 2d 1213, 1216 (Miss. 1998). We cannot stop here, however. Regardless of whether Newsome properly rebutted the presumption, the "Duty to Review Statements" under the Deposit Agreement requires the Court to consider whether the Deposit Agreement is properly interpreted and properly applied under Chapter 4 of the UCC.

¶45. Newsome argues that, although Chapter 4A does not apply, Chapter 4 does apply. Citing Mississippi Code Section 75-4-103, Newsome argues that the Bank and Dunn cannot disclaim their own responsibility for a lack of good faith and a failure to exercise ordinary care or limit the measure of damages. Although the Bank and Dunn argue that Chapter 4A applies, they do not argue that Chapter 4 does *not* apply. In fact, the Bank and Dunn cite Chapter 4, specifically Section 75-4-103, to argue that the thirty-day deadline in the Deposit Agreement is valid.

¶46. Chapter 4 applies to bank deposits and collections, including checks. *See* Miss. Code Ann. §§ 75-4-101 and 75-4-102 (Rev. 2016). Therefore, we agree with all the parties that Chapter 4 applies. In full, Section 75-4-103(a) states:

> (a) The effect of the provisions of this chapter may be varied by agreement, but the parties to the agreement cannot disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure. However, the parties may determine by agreement the standards by which the bank's responsibility is to be measured if those standards are not manifestly unreasonable.

Miss. Code Ann. § 75-4-103(a) (Rev. 2016). The comment further explains subsection (a), stating: "Subsection (a) confers blanket power to vary all provisions of the Article by agreements of the ordinary kind. The agreements may not disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care . . . ." Miss. Code. Ann. § 75-4-103 cmt. 2 (West, Westlaw through 1992 legislation).

¶47. Thus, the Bank and Dunn are correct that they had the authority and the right to create a Deposit Agreement and to implement a thirty-day deadline to review statements. However, as stated in Section 75-4-103, the Deposit Agreement cannot be used to disclaim the Bank's own responsibility for good faith or ordinary care.[12]

¶48. In the Deposit Agreement, the paragraph addressing the "Duty to Review Statements" states: "You MUST review your statement with reasonable promptness, and if you discover (or reasonably should have discovered) any errors or unauthorized activity involving signatures, including alterations or unauthorized signatures on withdrawal of items, you MUST notify us immediately in writing." However, the Bank and Dunn are using the "Duty

---

[12] Here, the Amended Complaint alleges bad faith.

21

to Review Statements" to disclaim their own responsibility for good faith and ordinary care. Under Section 75-4-103, this is not allowed. Further, "Duty to Review Statements" does not contemplate or address the Bank's own action of removing money from an account as miscellaneous debits and issuing cashier's checks that did not require the account holder's signature. Therefore, under the specific and unique facts of the instant case, the "Duty to Review Statements" does not save the Bank and Dunn from liability.

### (3) Whether the Uniform Commercial Code displaces Marilyn Newsome's common-law claims.

¶49. Newsome brought a number of common-law claims against the Bank and Dunn, including conspiracy, fraud, breach of contract, negligence, breach of the duty of good faith and fair dealing, negligence per se, gross negligence, intentional infliction of emotional distress. The Bank and Dunn argue that the common-law claims are barred. Newsome maintains that its common-law claims are not barred.

¶50. The UCC provides the following: "Unless displaced by the particular provisions of the Uniform Commercial Code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, and other validating or invalidating cause supplement its provisions." Miss. Code Ann. § 75-1-103(b) (Rev. 2016).[13]   In order

_____

[13]In 2010, the Section 75-1-103(b) was amended, and the word "shall" was deleted. Unif. Commercial Code--Conformance To Model Act, ch. 506, 2010 Miss. Laws (West). However, the deletion of "shall" does not make the subject caselaw non-binding because the change did not affect the current statute: "Unless displaced by the particular provisions of the Uniform Commercial Code, the principles of law and equity . . . supplement its provisions." Miss. Code Ann. § 75-1-103(b).

for the UCC to apply over common law, the UCC must specifically displace common law. *See* **Patel v. Telerent Leasing Corp.**, 574 So. 2d 3, 7 (Miss. 1990) ("Pre-UCC laws supplement code provisions and are still applicable unless displaced by particular provisions of the code."); *see also* **Gibson v. Manuel**, 534 So. 2d 199, 201 (Miss. 1988).

¶51.    In **Hancock Bank v. Ensenat**, 819 So. 2d 3 (Miss. Ct. App. 2001), the Court of Appeals held that Chapter 3 of the UCC displaced the common-law claims.  First, it considered that although the plaintiff had not brought suit under conversion, conversion had occurred and was the proper cause of action.  **Ensenat**, 819 So. 2d at 8-10.  Further, because Section 75-3-420 specifically provided the "measure of liability" for a conversion action, the **Ensenat** Court concluded that the UCC had displaced the common-law claims.  **Ensenat**, 819 So. 2d at 8 (citing Miss.  Code Ann. § 75-3-420 (Rev. 2016) ("The Code establishes the measure of Hancock Bank's liability for conversion.").  *See also* **Berhow v. Peoples Bank**, 423 F. Supp. 2d 562, 567–68 (S.D. Miss. 2006) ("In addition, § 75-3-420 displaces Berhow's common law claims insofar as her common law claims relate to the conversion of the instruments.").

¶52.    **Ensenat** and **Berhow** both specifically address the applicable language of the UCC at issue here.  However, Mississippi caselaw on the topic is limited.  Therefore, we look to caselaw around the country for guidance. While there may be some conflict about whether certain sections displace common law claims,[14] the general rule is that common-law claims

[14]*Compare* **Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.**, 597 F.3d 84, 90 (2d Cir. 2010) (stating, "Article 4A's text strongly suggests that it applies to claims asserting the existence of unauthorized wire transfers regardless of what the claims may be called . . . ."), *and* **Miller v. Union Planters Bank**, **N.A.**, 2006 WL 3391095 (S.D. Miss. Nov. 22, 2006)

are displaced when the UCC "directly addresses the allegations" or "specifically cover[s]" the allegations, even if, as in *Ensenat*, the allegations are improperly labeled. *Zengen, Inc. v. Comerica Bank*, 158 P.3d 800, 808 (Cal. 2007) (quoting *Sheerbonnet, Ltd. v. American Exp. Bank, Ltd.*, 951 F. Supp. 403, 407–408 (S.D.N.Y. 1995); *Choice Escrow & Land Title, LLC v. BancorpSouth Bank*, 754 F.3d 611, 625 (8th Cir. 2014).

¶53. The gravamen of the claims at issue here is the Bank's and Dunn's removal of money from the conservatorship account and issuance of cashier's checks without Newsome's signature or approval. The Bank and Dunn argue that Newsome's common law claims are barred under Article 4A. However, as concluded above, Article 4A does not apply, and the Bank and Dunn have failed to provide any additional specific provisions within the UCC that displace Newsome's common law claims. Thus, the Court holds the instant issue to be without merit.

### (4) Whether People's Bank risked contempt of court if the bank refused to comply with the court's orders.

¶54. The Bank and Dunn argue that they risked contempt if they refused to comply with the court's orders. This simply is not true. In *Miss. Bank v. Kelly*, 445 So. 2d 849 (Miss. 1984), following precedent, the Court reiterated that, in order to be held in contempt, the entity to be held in contempt must be given notice from the court and afforded an opportunity to be heard. *Id.* at 851. The Court stated:

---

(holding that Chapter 4A did not displace common-law claims and concluding that, in *Ensenat*, Chapter 3 of the UCC contained limiting language regarding the amount of recovery for conversion).

> [T]he decree of the chancery court requiring that the guardianship funds not be withdrawn without court order was entered without giving the Bank notice and affording it an opportunity to be heard. Consequently, the order was void insofar as it affected the Bank. Applying the principles of **Sinquefield** [**v. Valentine**, 132 So. 81 (Miss. 1931),] and **McKinney** [**v. McKinney**, 374 So. 2d 230 (Miss. 1979)], *supra*, the Bank cannot be held in contempt for failure to abide by the chancery court's decree.

*Id.* Thus, the Bank and Dunn would have been entitled to notice and an opportunity to be heard.

¶55. Further, the court's orders addressed neither how the money should be removed from the conservatorship account nor how the money should be delivered to the beneficiaries. Therefore, the issue is not whether the Bank and Dunn followed the court's orders,[15] the issue is whether the Bank and Dunn were authorized to remove money from the conservatorship account and issue cashier's checks *without the account holder's signature or approval*.

### (5) Whether Chris Dunn is entitled to summary judgment on claims against him in his individual capacity.

¶56. The Bank and Dunn argue that it is undisputed that Dunn did not act in any manner that would justify personal liability. On the other hand, without citing any authority in her brief, Newsome argues that she has brought claims against Dunn individually.

¶57. Newsome cites no authority to support her argument. "Failure to cite legal authority in support of an issue is a procedural bar on appeal." **Webb v. DeSoto Cty.**, 843 So. 2d 682, 685 (Miss. 2003). The Court has stated:

> We have consistently held that "an argument unsupported by cited authority need not be considered by the Court." **Dowdle Butane Gas Co. v. Moore**, 831

---

[15]The court's orders here did provide the final recipients of the money, and based on the record before the Court, those recipients received the money.

25

So. 2d 1124, 1136 (Miss. 2002). In addition, we have expressly held that "[i]t is the duty of an appellant to provide authority in support of an assignment of error." ***Jones v. Howell***, 827 So. 2d 691, 702 (Miss. 2002). Where an assertion of error is not supported by authority, that assertion is deemed abandoned. ***Id.*** This Court is therefore procedurally barred from considering unsupported assertions on appeal. ***Webb v. DeSoto County***, 843 So. 2d 682, 685 (Miss. 2003).

***Alexander v. Womack***, 857 So. 2d 59, 62 (Miss. 2003). Thus, the procedural bar applies.

Despite the bar, Newsome also has maintained consistently (in her Amended Complaint and in her Motion for Summary Judgment) that the Bank is vicariously liable for Dunn's actions under the doctrine of respondeat superior.

¶58.    In sum, Newsome's argument that Dunn is individually liable is unsupported by any cited authority and contradicts her previous arguments. Thus, the Court affirms the grant of summary judgment for Dunn, although under different reasoning.

## CONCLUSION

¶59.    For the reasons explained above, the Court affirms in part and reverses in part the judgment of the trial court on appeal. Further, under different reasoning, the Court affirms the judgment of the trial court on cross-appeal. Finally, the Court remands the case for further proceedings consistent with the opinion.

¶60.    **ON DIRECT APPEAL: AFFIRMED IN PART, REVERSED IN PART AND REMANDED. ON CROSS-APPEAL: AFFIRMED.**

**WALLER, C.J., RANDOLPH AND KITCHENS, P.JJ., KING, COLEMAN, MAXWELL AND ISHEE, JJ., CONCUR. BEAM, J., NOT PARTICIPATING.**

26